## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**STEPHEN M. DEWALT,**

      **Plaintiff,**

      **v.**                                    **Case No.  05-2544-JWL**

**MEREDITH CORPORATION d/b/a
KCTV-5,**

      **Defendant.**

_____

### MEMORANDUM AND ORDER

Plaintiff Stephen M. DeWalt was formerly a television news photographer for defendant Meredith Corporation d/b/a KCTV-5.  He alleges that the station unlawfully discriminated against him on the basis of his age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634.  Mr. DeWalt resigned following what he contends was an approximately two-year period of age discrimination and harassment that began around the time KCTV-5 implemented a new management regime and news program format entitled "Live. Late-Breaking. Investigative." This matter is currently before the court on Defendant Meredith Corporation's Motion for Summary Judgment (doc. #46).  For the reasons explained below, the court will dismiss certain aspects of plaintiff's claims for lack of jurisdiction based on plaintiff's failure to timely file an administrative charge.  The court will grant defendant's motion with respect to the remainder of plaintiff's claims because the record does not reflect a genuine issue of material fact that plaintiff was subjected to an

actionable adverse employment action or that plaintiff was subjected to a hostile work environment.

## STATEMENT OF MATERIAL FACTS[1]

Defendant Meredith Corporation owns and operates KCTV-5, the local CBS television affiliate.  Mr. DeWalt worked for KCTV-5 for thirty-one years from 1973 until February 8, 2004.  From 1975 on, he worked as a television news photographer.  As such, his primary duties included photographing news, setting up and operating lighting equipment, and creative editing of news material.  His secondary duties included operating electronic news gathering (ENG) equipment and cameras, transmitting and recording news video and/or audio feeds including ENG feeds, and performing limited newsgathering functions.

Beginning in the spring or early summer of 2002, KCTV-5 management decided to adopt a new format, or "brand," for its local news programming.  This new format was called "Live. Late-Breaking. Investigative."  According to Regent Ducas, News Director at the

---

[1] Consistent with the well established standard for evaluating a motion for summary judgment, the following facts are either uncontroverted or stated in the light most favorable to plaintiff, the nonmoving party.

Under D. Kan. Rule 56.1, a party opposing a motion for summary judgment must set forth in separately numbered paragraphs any facts not contained in the movant's memorandum unless such facts directly controvert one of the movant's facts.  Instead of following this procedure, in response to defendant's statement of facts plaintiff has included facts which should have been set forth in separate factual statements because they did not directly address the factual statements of defendant to which they purported to respond.  The court has nonetheless included those additional factual statements, to the extent supported by the record and not properly controverted by defendants, in the light most favorable to plaintiff.

station, this meant urgent news, i.e., "[t]hat it's a very urgent sense of the day's news."  He

further described the news as follows: "No matter what it is, we're going to be there and

we're going to have it and investigative in nature."  Terry Kurtright, Operations Manager,

stated that with the new format "the pressure was enormous on all of us.  It had to be right

now."[2]

At the time the station adopted this format, Mr. DeWalt was (as he had been for years)

assigned to the day shift.  According to Mr. Kurtright, with the new format Mr. DeWalt could

not handle the afternoon news because of the editing required.  One of Mr. DeWalt's

complaints in this case is that he was denied training on the AVID video editing system, a

new technology integral to the new branding "Live. Late-Breaking. Investigative."  Mr.

Kurtright testified that knowing the AVID system was necessary for success on the important

daytime newscasts.  Mr. DeWalt also contends that he was denied needed training on a new

"live truck" that differed in operation from the others.  KCTV-5 acquired the ENG vehicle

or "live truck" and switched to the AVID editing system sometime before November of

---

[2] Mr. DeWalt testified in his deposition as to what he thought of the new "Live. Late-Breaking. Investigative." format:

> It was awful.  I think it's just tabloid, yellow bottom feeding television that panders to the worst instincts of people.  If I were the black community, I would be outraged of how it is portrayed night after night as being nothing but a killing field over there.  I think Channel 5 news is disgusting.  It's yellow.  I don't care for it.
>
> . . . .
>
> A car wreck is like Osama bin Laden's kidnapping somebody.  Someone has flatulence in Olathe; you're out there with a wind storm.  A bum pees off the roof.  Look, it's snowing.  They overhype everything.

2002.  Plaintiff stated in his deposition that he believed that the denial of training on the AVID system and the "live" truck also occurred prior to that November.

On October 11, 2002, Mr. DeWalt received from Mr. Ducas what Mr. DeWalt regarded to be his first "write-up" in nearly three decades of service.  The write-up stated that his work performance did not meet expectations and standards for a news photographer at KCTV-5 because of two incidents that had occurred within the week prior to the write-up. It concluded that his ability to get along with others was exemplary and that the station appreciated his efforts, but that he must pay closer attention to details and focus on his day-to-day assignments.  Mr. DeWalt was not docked any pay as a result of the performance issues described in the write-up, and the write-up said nothing about discipline or termination.

In November of 2002, Mr. DeWalt was assigned to the overnight shift which ran from 10:00 p.m. to 6:00 a.m.  Within months, his shift was adjusted slightly to midnight to 8:00 a.m.  Photographers and reporters typically worked in pairs, and the change allowed his shift to coincide with the shift of the reporter with whom he worked at the time.  The overnight shift was considered an entry-level position that typically did not lead to high visibility projects or awards.  The reason the station reassigned Mr. DeWalt's to the overnight shift is highly controverted.  Defendant contends that Mr. DeWalt was better suited to the overnight shift because he did not perform as well as other photographers in the stressful, time-sensitive situations (presumably meaning the day shift) whereas the overnight shift involved the production of only a single morning newscast.  Defendant further contends that the change

in plaintiff's shift was permitted under the terms of the governing union contract.  Although plaintiff disputes the meaning of the relevant provision of the union contract, he testified in his deposition that it was his understanding that the station "can give you any shift that they want to."  Contrary to defendant's contention that there was less pressure on the overnight shift, plaintiff believed there was more pressure on the overnight shift than the day shift.  He and his on-air reporter would come in and drive all over the city a minimum of a hundred miles a night.  Then at 4:00 a.m. they would have to be back to set up a live shot to "hype" something.  The evidence Mr. DeWalt has submitted establishes that, at a bare minimum, he was at least an above-average photographer at the station and that defendant's asserted justification for the shift transfer morphed over time and is filled with contradictions.  Although Mr. DeWalt characterized the shift change as a demotion, his title, benefits, and responsibilities remained the same.  His pay did not change, although he points out that his pay was dictated by union contract and was not subject to change.[3]

As the operations manager, Mr. Kurtright "was kind of in charge of the trucks and getting cars' oil changed and licenses, things like that."  Mr. DeWalt, along with other KCTV-5 photographers, received memoranda from Mr. Kurtright concerning day-to-day issues.  One of these memoranda was dated February 12, 2003.  Mr. Kurtright gave this memorandum to plaintiff shortly after he came on the overnight shift.  It states that when Mr. Kurtright checked one of the vans that morning, the wastebasket was full of trash and the van

---

[3] As a union member, Mr. DeWalt's pay was based entirely on seniority rather than merit.

smelled of cigarette smoke.  Mr. Kurtright reminded Mr. DeWalt to make sure that when he is finished with a vehicle that the vehicle should be charging and all trash cleaned out, and that there is no smoking in company vehicles.  According to Mr. DeWalt, however, "those trucks are rolling Deffenbaugh trucks to begin with, and [he] couldn't figure out why it would be [his] job to empty the truck after slobs had been in it all day long."  Also, although Mr. DeWalt smokes, he did not smoke in the news trucks.  Another time, Mr. DeWalt left on an interior light in a truck and was "written up for [that] severely."  On another occasion, he was written up for telling the assistant chief engineer that a wireless microphone "doesn't work," even though that was exactly what Mr. Kurtright had told him to do, because apparently Mr. DeWalt was supposed to have been more explanatory.  Mr. DeWalt recalled receiving another memorandum that talked about dismissal.  Other than the memorandum dated February 12, 2003, copies of these other memoranda were not placed in plaintiff's personnel file, as would have been required under Meredith's progressive disciplinary policy if the memos had been considered disciplinary.  Plaintiff contends that it should not be inferred from the fact that the memoranda were not in his personnel file that they were not disciplinary; instead, he contends that the more logical conclusion is that they were misfiled. He contends that the fact that the only known copies of these memos were produced by him in this lawsuit is evidence that defendant did not follow its own policy requiring documentation of performance issues.  As a result of the various issues described in the memoranda from Mr. Kurtright, plaintiff was not suspended and he did not receive a reduction in pay or loss of hours.

6

Mr. DeWalt contends that in 2003 he was denied five weeks of vacation leave. He was entitled to a total of seven weeks of paid vacation that year. He requested and received two weeks early in the year. Later that year, in October or November, he contacted Mr. Kurtright regarding his unused vacation. Rather than following the formal process of submitting a written vacation leave request, he simply asked Mr. Kurtright how he should use his vacation such that it would not adversely impact the situation. Specifically, he wrote Mr. Kurtright a memorandum noting that he had some vacation coming up. He asked Mr. Kurtright: "Can we sit down and figure out when to take it." He never heard back from Mr. Kurtright about the subject. As a result, plaintiff did not take his remaining five weeks of vacation that year.

Plaintiff contends that the station engaged in a pattern of age-based harassment that permeated the work environment with hostility. He explained as follows:

> people that had any length of time with Meredith and were over 40 years old were pretty much rounded up, herded out the door. A lot of people were harassed, demoted. There was at least one firing that I know of. And these were all people that had been with that company a long time and had excellent work records.
> . . . .
> . . . they're just trying to get rid of any older worker that was around there and anybody that had any vacations, seniority, and I think it all stemmed from Mr. O'Brien, his feeling that the workers at Channel 5 were lousy, and just his buzzword for anybody that had any length of time with that company.

Older employees were demoted and replaced by younger employees. Mr. DeWalt has submitted affidavits from five of his former co-workers which generally support Mr.

DeWalt's perceptions of the station's culture.  Those affidavits indicate that some of those other individuals were also the victims of arbitrary discipline.

Mr. DeWalt testified in his deposition that the harassment and abusive work environment resulted from KCTV-5 management's belief that they "owned you."  He admitted that this attitude applied to all employees, regardless of their age.  Throughout the course of his deposition, he described other harassing conduct directed at older employees.  He testified that members of management made ageist comments.  Alvie Cater, a producer, stated that he believed that the photographers on the overnight shift were assigned there because they were old.  Mark Berryhill, who was in charge of news operations for Meredith, instructed Mr. Ducas to "fire all the old reporters."  During the first videoconference with Kevin O'Brien, who took over broadcasting at KCTV-5 in June of 2002, Mr. O'Brien "called us dinosaurs over at Channel 5" and "referred once to Old Meredith," which Mr. DeWalt understood to mean "the older employees."  Plaintiff has submitted his own affidavit as well as affidavits from four other fifty- and sixty-something former KCTV-5 employees which generally evidence that younger employees were treated more favorably than older employees.

In January of 2004, Mr. DeWalt received a verbal reprimand from Mr. Ducas for allegedly failing to return a call requesting that Mr. DeWalt come in on his day off in order to prepare for coverage of an expected snowstorm.  Plaintiff, however, testified in his deposition that he did not receive the call.  According to plaintiff, Mr. Ducas called him into his office and said the station had tried to get hold of plaintiff on Sunday for its big storm

coverage (the storm never happened), left several messages on his answering machine, talked to plaintiff's son, and plaintiff never called back. Mr. DeWalt told Mr. Ducas that, for one thing, he has girls, not a son, so he thought Mr. Ducas either had the wrong number or something else happened. The union had told Mr. DeWalt many times that he did not have to call in and did not even have to answer his phones on his days off. He checked his caller ID and there was no call from the station. He also asked both of his daughters if they received a call from the station, and they said he did not. Mr. Ducas considered the conversation to be a verbal warning, which is the first step in a series of disciplinary actions. As a result of the incident, plaintiff was not suspended, did not have his pay reduced, and did not lose any other employment benefit.[4]

On February 8, 2004, Mr. DeWalt resigned from KCTV-5, effective immediately. His letter of resignation stated as follows: "The working environment at KCTV is hostile and destructive. Constant threats of dismissal by management have caused the environment to become intolerable." His letter ends: "I had hoped [to] end my distinguished career from KCTV with retirement at the appropriate time. I never imagined having to seek other employment to escape constant, demoralizing harassment." Mr. DeWalt testified in his deposition that he resigned due to the helplessness he felt as he watched older employees being harassed and herded out the door.

---

[4] Mr. DeWalt was one of two photographers called in for the expected storm who did not either return the call or come in to the station. The other photographer who received the verbal reprimand was Chuck Prewitt, who also is in the protected age group.

After Mr. DeWalt resigned, Ken Mishoe, the head of Human Resources in Des Moines, Iowa, contacted him about the reason for his resignation.  Mr. DeWalt did not talk to Mr. Mishoe, but e-mailed him as follows:

> After giving some thought to your request, I do not believe it is in my best interest to outline the demeaning harassment that led to my resignation. The treatment of employees at KCTV is something that has been brought to Meredith's attention through union negotiations, surveys and other avenues, yet the harassment of older employees with at least 20 years of service has not stopped.
> As far as I'm concerned, the harm is done and since I am no longer an employee, I have no motivation to spell everything out in writing for Meredith.

During the time Mr. DeWalt was employed by KCTV-5, he never lost pay as a result of any disciplinary action taken against him, never lost a pay grade, and was never suspended.

Plaintiff has submitted what he contends is statistical evidence that buttresses his complaints of discrimination.  The statistics are derived from what he contends are supporting documents.  Defendant objects to this evidence on the grounds that it is "nothing more than a set of incomprehensible numbers drawn from unknown sources" unsupported by any meaningful expert analysis.  Although the court is not unsympathetic to defendant's concerns, the court will accept as true, for purposes of resolving defendant's motion for summary judgment, the proposition for which the evidence was intended, which is that a higher percentage of older employees than younger employees were terminated during the new "Live. Late-Breaking. Investigative." regime.  The court will allow this inference without resolving defendant's objections because this evidence does not sway the court's

10

determination of whether defendant is entitled to summary judgment in any event. This evidence supports the notion that older employees were treated less favorably than younger employees during the new regime. But, viewing the evidence in the light most favorable to plaintiff, this fact is already established by the summary judgment record. Thus, the statistical evidence really does not add much to the factual record. Moreover, this evidence is not legally relevant because, for reasons explained below, it does not change the applicable burden-shifting framework.

## JURISDICTION

Before delving into the merits of defendant's motion for summary judgment, the court first turns to the issue of jurisdiction. The parties have alluded to this issue only briefly in footnotes. In two brief footnotes contained in defendant's memorandum in support of its motion for summary judgment, defendant contends that plaintiff's shift change and lack-of-training claims are barred because plaintiff did not timely file an administrative charge with respect to these incidents. Plaintiff responds to these arguments, again, only briefly in a footnote in which plaintiff argues that Mr. DeWalt's claim may be deemed timely under the single filing rule as a result of Stuart Lebow's earlier-filed charge in August of 2003, citing *Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095, 1110 (10th Cir. 2001). Despite the cursory record on this issue, the court must satisfy itself that it has subject matter jurisdiction over plaintiff's claims before the court considers the merits of defendant's motion for summary judgment. *Shikles v. Sprint/United Mgmt. Co.*, 426 F.3d 1304, 1318

11

(10th Cir. 2005) (district court erred in granting summary judgment where the court should have dismissed case based on a lack of subject matter jurisdiction). Given the approaching trial date just over a month away, the court will proceed to decide this matter based on the current record.

A plaintiff's exhaustion of administrative remedies is a jurisdictional prerequisite to suit under the ADEA. *Id.* at 1317. Claims under the ADEA are time-barred to the extent that the plaintiff did not file an administrative charge within three hundred days of the alleged discriminatory act. *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1222 (10th Cir. 2006). Plaintiff filed his complaint with the KHRC on April 23, 2004. Therefore, the discriminatory actions on which he bases his claims must have occurred on or after June 28, 2003.

The record reflects that plaintiff's initial shift change from day shift (10:00 a.m. to 6:00 p.m.) to overnight shift (2:00 a.m. to 10:00 a.m.) occurred in November of 2002. This date is set forth in his charge of discrimination. The only evidence to the contrary is that he initially testified in his deposition that he believed the shift change occurred in 2003. Later in his deposition, however, he accepted the November 2002 date set forth in his charge of discrimination as the date of the shift change. Plaintiff also stated in his deposition that the asserted lack of training on the AVID video system and the live truck occurred prior to the initial shift change in November of 2002. The subsequent adjustment to the time of plaintiff's overnight shift to midnight to 8:00 a.m. occurred, according to his administrative charge, "[s]everal months later," meaning several months after November of 2002. More

12

precisely, plaintiff testified in his deposition that this change occurred "three months or so after that, thereabouts, I believe." Thus, the subsequent adjustment to his shift time occurred in approximately February of 2003. Even granting some degree of latitude for plaintiff possibly being off a month or two with this time estimate, the adjustment to his overnight shift time still occurred before June 28, 2003. Because all of these alleged discriminatory acts occurred prior to June of 2003, then, the court lacks subject matter jurisdiction over those aspects of plaintiff's claim.

Plaintiff's contention that these aspects of Mr. DeWalt's claim are timely under the single filing rule by virtue of an earlier-filed charge by his former co-worker, Stuart Lebow, is without merit. As a general rule, an individual plaintiff must exhaust his or her administrative remedies by filing a timely EEOC charge prior to bringing suit. *Foster v. Ruhrpumpen, Inc.*, 365 F.3d 1191, 1197 (10th Cir. 2004). But, "in a multiple-plaintiff, non-class action suit, if one plaintiff has filed a timely EEOC complaint as to that plaintiff's individual claim, then co-plaintiffs with individual claims arising out of similar discriminatory treatment in the same time frame need not have satisfied the filing requirement." *Id.* (quotation omitted). This creates an exception to the individual filing requirement known as the "single filing rule," or "piggybacking," *id.*, by which a plaintiff may piggyback on a co-plaintiff's EEOC charge. In this case, however, Mr. Lebow is not a co-plaintiff. This is not a multiple plaintiff case or a collective action involving opt-in plaintiffs, as was the case where the Tenth Circuit applied the single filing rule in the case

13

cited by plaintiff, *Thiessen*, 267 F.3d at 1110. Consequently, Mr. DeWalt may not piggyback on Mr. Lebow's EEOC charge.

Accordingly, plaintiff's shift change and failure-to-train claims are dismissed based on a lack of jurisdiction. With this threshold jurisdictional issue resolved, then, the court will proceed to decide the merits of defendant's motion for summary judgment.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet

that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256; *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671). To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Adams,* 233 F.3d at 1246.

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

**ANALYSIS**

15

For the reasons explained below, the court finds that the record does not demonstrate a genuine issue of material fact concerning whether plaintiff suffered an adverse employment action that is actionable under the ADEA. Additionally, the record does not demonstrate a genuine issue of material fact concerning whether plaintiff was subjected to a hostile work environment. Defendant is therefore entitled to summary judgment on plaintiff's age discrimination and harassment claims.

## I.    Age Discrimination Claim

Plaintiff's threshold argument in opposition to defendant's motion for summary judgment is that KCTV-5 engaged in a pattern or practice of age discrimination and, consequently, the applicable burden-shifting framework is the one set forth in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977). In this respect, the court notes that the pretrial order includes a separate pattern-or-practice claim. The *Teamsters* pattern-or-practice method of proving discrimination, however, is not available to individual plaintiffs. *See Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 575 (6th Cir. 2004); *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 761 (4th Cir. 1998), *vacated on other grounds*, 527 U.S. 1031 (1999). "[A] pattern-or-practice claim is focused on establishing a policy of discrimination; because it does not address individual hiring decisions, it is inappropriate as a vehicle for proving discrimination in an individual case." *Bacon*, 370 F.3d at 575. Nevertheless, an individual may use evidence of a pattern or practice of discrimination to help prove claims of individual discrimination within the *McDonnell Douglas* framework.

*Mendelsohn v. Sprint/United Mgmt. Co.*, 466 F.3d 1223, 1227 n.2 (10th Cir. 2006) (pattern-or-practice evidence is admissible in individual cases of discrimination as circumstantial evidence of a defendant's discriminatory animus); *see Bacon*, 370 F.3d at 575 (pattern-or-practice evidence may be relevant to proving an otherwise-viable individual claim for disparate treatment under the *McDonnell Douglas* framework); *Lowery*, 158 F.3d at 761 (noting such evidence may be useful in an individual discrimination claim to give rise to an inference of unlawful discrimination, or that the employer's articulated reasons for the adverse action was merely pretext, or to establish the employee's ultimate burden).

In this case, then, to the extent that the summary judgment record reflects that KCTV-5 engaged in a pattern or practice of age discrimination, the relevance of that evidence is in the context of plaintiff's individual claim. Because this is not a class action or collective action, plaintiff does not have a separate, stand-alone pattern-or-practice claim. Plaintiff may use what he contends is pattern-or-practice evidence to help prove his claim within the *McDonnell Douglas* framework. But, the applicable burden shifting framework is the traditional *McDonnell Douglas* approach, not the *Teamsters* approach. *See Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 356 (5th Cir. 2001) (district court did not err in refusing to apply the *Teamsters* method of proof, in lieu of the *McDonnell Douglas* method, to individual claims at the summary judgment stage).

Under the *McDonnell Douglas* burden-shifting framework, the plaintiff in an ADEA case bears the initial burden of setting forth a prima facie case of discrimination. *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 531 (10th Cir. 1998). The plaintiff must show that he or

she (1) is a member of the protected class, (2) suffered an adverse employment action, (3) was qualified for the position at issue, and (4) was treated less favorably than others not in the protected class. *Id.* "Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the action. If the defendant does so, the plaintiff must show the defendant's proffered reasons are pretextual." *Id.* In this case, defendant contends that plaintiff did not suffer an actionable adverse employment action.

A. *Adverse Employment Action*

The phrase "adverse employment action" is liberally defined and is not simply limited to monetary losses in the form of wages or benefits. *Sanchez*, 164 F.3d at 532. The court takes a case-by-case approach, examining the unique factors relevant to each situation. *Id.* Adverse employment action includes "'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). A mere inconvenience or alteration of job responsibilities is not an adverse employment action. *Id.*

Mr. DeWalt contends that he suffered adverse employment action inasmuch as he received various memoranda from Messrs. Ducas and Kurtright and he was verbally reprimanded by Mr. Ducas after the incident where he allegedly did not return phone calls from the station concerning the anticipated snowstorm coverage. There is no evidence, however, that any of these memoranda or reprimands (to the extent that they qualify as such)

18

caused plaintiff to suffer any tangible negative consequences in his employment status.  His responsibilities, pay, and benefits remained the same, and the record does not suggest that any of these incidents placed him in jeopardy of being terminated or demoted.  *See Haynes v. Level 3 Commc'ns*, 456 F.3d 1215, 1224 (10th Cir. 2006) (noting a written warning is an adverse employment action only if it effects a significant change in the plaintiff's employment status; finding employee's placement on performance improvement plan, standing alone, did not have any immediate effect on her employment status because she was not demoted, her pay did not change, and her responsibilities were not significantly modified); *Sanchez*, 164 F.3d at 533 (unsubstantiated oral reprimands do not constitute adverse employment action absent evidence that they had some impact on the employee's employment status).  Consequently, no reasonable jury could conclude that any of these incidents were sufficient to constitute adverse employment actions.  *Cf. Roberts v. Roadway Exp., Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998) (written warnings constituted adverse actions where evidence demonstrated that the more warnings an employee received, the more likely he or she was to be terminated for a further infraction).

Plaintiff also contends that he was denied five weeks of vacation in 2003.  Certainly, the denial of vacation time can, in appropriate circumstances, constitute an adverse employment action.  *See Coffman v. Tracker Marine, L.P.*, 141 F.3d 1241, 1243 (8th Cir. 1998) (denial of vacation days "easily qualifies as an adverse employment action because it was a material change in one of Coffman's existing employment benefits").  In this case, however, the summary judgment record simply does not reflect that the station actually

denied plaintiff his vacation time.  Instead, Mr. DeWalt testified in his deposition that he wrote Mr. Kurtright a memorandum asking if they could "sit down and figure out" when Mr. DeWalt could take his remaining vacation, and Mr. DeWalt did not hear back from Mr. Kurtright.  Mr. Kurtright's failure to accept plaintiff's invitation to discuss when he should take his vacation falls far short of an outright denial of a vacation request.  The fact that Mr. Kurtright did not respond to Mr. DeWalt's invitation to talk about when he could use his remaining vacation time in 2003 was an inconvenience; it did not amount to a significant change in plaintiff's employment status.  Consequently, a rational trier of fact could not conclude that it constituted an adverse employment action.  *See Kennedy v. Gen. Motors Corp.*, 226 F. Supp. 2d 1257, 1267-69 (D. Kan. 2002) (fact that plaintiff did not receive the vacation time she had requested did not constitute adverse employment action where there was no evidence that the plaintiff was denied vacation time altogether); *see also*, *e.g.*, *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) (plaintiff did not suffer adverse employment action where employer refused her preferred vacation schedule).

> B.      *Constructive Discharge*

"Constructive discharge occurs when an employer deliberately makes or allows the employee's working conditions to become so intolerable that the employee has no other choice but to quit." *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1281 (10th Cir. 2005); *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002) (noting that "[t]he bar is quite high" for the employee to show that he or she had no other choice but to quit).  The voluntariness of an employee's resignation is judged under an objective standard

20

as to whether a reasonable employee would have had no other choice but to quit. *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135-36 (10th Cir. 2004); *Sandoval v. City of Boulder*, 388 F.3d 1312, 1325 (10th Cir. 2004). The employees' subjective views of the situation are irrelevant, *MacKenzie*, 414 F.3d at 1281, as are the employer's subjective intentions toward the employee, *Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005). "If an employee resigns of her [or his] own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged." *Id.* (quotation omitted).

A rational trier of fact could not conclude, based on the summary judgment record, that a reasonable employee in plaintiff's position would have felt that he had no other choice but to quit. Plaintiff points out that he saw many individuals in the protected class harassed, terminated, and generally treated discriminatorily; that he was transferred to the overnight shift, an entry-level position, because of his age; that he began receiving write-ups and threatened termination for petty issues such as failing to clean up after the day shift; and that his health began to suffer such that both his wife and psychologist recommended that he quit. Certainly, the evidence viewed in the light most favorable to plaintiff reflects that during the last two years of his employment working conditions for older workers deteriorated to the point that they were difficult and unpleasant. The issue, however, is not whether working conditions were difficult or unpleasant, but rather whether the employer allowed the employee the opportunity to make a free choice regarding his employment relationship. *Exum*, 389 F.3d at 1135. The record reflects that plaintiff could have continued to work at the station, even though that option may not have been very appealing to him. The situation

also appears to have caused considerable grief and hardship for plaintiff after more than thirty years of employment with the station.  But "the fact that a plaintiff subjectively considers his or her workplace stressful and may have suffered personal health problems as a result is not an objective criterion used to determine if a reasonable employee would have been compelled to resign."  *Id.* at 1136 n.7 (citing *Sanchez*, 164 F.3d at 534).  Clearly, Mr. DeWalt's working conditions were less than ideal, but they were by no means so intolerable that a reasonable employee would have felt that he or she had no other choice but to quit.

In sum, plaintiff has not raised a genuine issue of material fact that he was constructively discharged or that he suffered any other adverse employment action.  Because plaintiff has not set forth a prima facie case of age discrimination, then, defendant is entitled to summary judgment on plaintiff's age discrimination claim.  The court need not consider defendant's asserted non-legitimate non-discriminatory reasons for its actions or evaluate whether those reasons were a pretext for unlawful discrimination.

## II.     <u>Harassment Claim</u>

For a hostile environment claim to survive summary judgment, the plaintiff must show that a rational jury could find that the workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, *MacKenzie*, 414 F.3d at 1280, and that the harassment stemmed from age-related animus, *Holmes v. Regents of the Univ. of Colo.*, Case No. 98-1172, 1999 WL 285826, at *7 (10th

Cir. 1999).  The severity and pervasiveness of the conduct must be judged from both an

objective and a subjective perspective; that is, "the environment must be both subjectively

and objectively hostile or abusive."  *MacKenzie*, 414 F.3d at 1280.  To evaluate whether a

working environment is objectively hostile or abusive, the court examines all the

circumstances, including "(1) the frequency of the discriminatory conduct; (2) the severity

of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere

offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's

work performance."  *Id.*

Applying these principles, the court concludes that the record falls far short of

showing age-related harassment.  The court begins with the arguably ageist comments made

by some of Meredith's management personnel.  During the first video conference with Kevin

O'Brien, who took over broadcasting at KCTV-5 in June of 2002, Mr. O'Brien "called us

dinosaurs over at Channel 5" and "referred once to Old Meredith," which Mr. DeWalt

understood to mean "the older employees."[5]  Mark Berryhill, who was in charge of news

operations for Meredith, instructed Mr. Ducas to "fire all the old reporters."  Alvie Cater, a

producer, stated that he believed that the photographers on the overnight shift were assigned

---

[5] It is unclear from Mr. DeWalt's deposition testimony whether Mr. O'Brien made both of these comments during the referenced video conference, or whether he made the "dinosaurs" comment during the video conference and the "Old Meredith" comment at a later date.  It appears from the gist of plaintiff's testimony that he very well may have made them both during the same video conference.  But, the record is not entirely clear on that point.  Thus, viewing the evidence in the light most favorable to plaintiff, the court construes the testimony to mean that he made the comments on two separate occasions.

there because they were old.  The significance of Mr. Cater's comment can be discredited because, as defendant points out in its reply memorandum in support of its motion for summary judgment, plaintiff's own deposition testimony establishes that Mr. Cater was a co-worker, not one of plaintiff's supervisors.  DeWalt Depo. at 17:7-8 ("He was not part of upper management.  Alvie was kind of a worker bee with us."); *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998) (age-related remarks by non-decision makers cannot form the basis of a hostile work environment claim).  As for the remaining three comments by Messrs. O'Brien and Berryhill, they were sufficiently isolated that they fall well short of the "steady barrage of opprobrious [age-based] comments" necessary to show a pervasively hostile work environment.  *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007); *see Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005) (holding two racially offensive remarks "fall far short of the 'steady barrage' required for a hostile environment claim"); *see also Peterson v. Scott County*, 406 F.3d 515, 524 (8th Cir. 2005) (fact that supervisor made regular references to "old ladies," once did not allow the plaintiff to participate in a training session because it was "too hard to train old ladies," and once commented that she "didn't have the right parts" to fill in shifts were isolated incidents which did not reach an actionable level of harassment); *Russell v. Board of Trustees*, 243 F.3d 336, 343 (7th Cir. 2001) (supervisor's demeaning habit of calling employee "grandma" was not actionable level of harassment); *Crawford v. Medina General Hosp.*, 96 F.3d 830, 836 (6th Cir. 1996) (supervisor's comments that she did not "think women over 55 should be

working" and that "[o]ld people should be seen and not heard" did not create hostile work environment).

Plaintiff's more overriding theory in support of his hostile environment claim is based on a culture of ageist discrimination that emerged at the station with the new "Live. Late-Breaking. Investigative." regime.  Plaintiff has submitted his own affidavit as well as affidavits from four other former KCTV-5 employees in their 50's and 60's which generally reflect that younger employees were treated more favorably than older employees.  Mr. DeWalt observed that other employees with longevity at the station were being "herded" out the door or given disadvantageous assignments.  The record, viewed in the light most favorable to plaintiff, certainly reflects that younger employees were given better working assignments while older employees were singled out for unfair scrutiny, nitpicked on their job duties and performance, and disciplined for things for which they were not responsible.  This evidence, however, does not involve the type of age-related "comments or ridicule that are hallmarks of hostile work environment claims."  *Trujillo v. Univ. of Colo. Health Sciences Center*, 157 F.3d 1211, 1214 (10th Cir. 1998); *accord Holmes*, 2007 WL 285826, at *7.  The record does not show that any of these other incidents involved discriminatory intimidation, ridicule, or insult directed at plaintiff himself, *see, e.g.*, *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 190 (4th Cir. 2004) (no hostile environment claim where general culture at the workplace was one that tolerated racial discrimination and contained a glass ceiling for African-Americans because there was no evidence of racially offensive conduct directed at the plaintiff himself), or any of the other KCTV-5 employees, *see, e.g.*,

25

*Caver v. City of Trenton*, 430 F.3d 243, 263 (3d Cir. 2005) (same, where plaintiff pointed solely to racial comments directed at other individuals); *Moser v. Indiana Dep't of Corrections*, 406 F.3d 895, 903 (7th Cir. 2005) (noting second-hand harassment is less objectionable than harassment directed at the plaintiff).[6]

In sum, the summary judgment record does not reflect a genuine issue of material fact concerning whether plaintiff was subjected to a hostile work environment. Accordingly, defendant's motion for summary judgment on plaintiff's harassment claim is granted.

**IT IS THEREFORE ORDERED BY THE COURT** that plaintiff's shift change and failure-to-train claims are dismissed for lack of jurisdiction.

**IT IS FURTHER ORDERED THAT** Defendant's Motion for Summary Judgment (doc. #46) is granted with respect to the remainder of plaintiff's claims.

**IT IS FURTHER ORDERED THAT** Plaintiff's Motion to Consolidate (doc. #46) is denied as moot.

---

[6] This evidence could be relevant toward showing pretext on an age discrimination claim. It also could be relevant to the contextual analysis of whether discriminatory intimidation, ridicule, or insult is sufficiently hostile. But the court is unaware of any authority to suggest that this "cultural" evidence is sufficient, in and of itself, to provide the basis for a hostile work environment claim in the absence of evidence of meaningful verbal or physical abuse stemming from age-based animus.

**IT IS SO ORDERED** this 4th day of May, 2007.


s/ John W. Lungstrum
John W. Lungstrum
United States District Judge